UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARIANNE ZIPPRICH,
on behalf of her child,
HEATHER ZIPPRICH,

        Plaintiff,

                                           **MEMORANDUM & ORDER**

    v.                                          05-CV-3252 (NGG)

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.
----------------------------------------------------------X
GARAUFIS, United States District Judge.

       Marianne Zipprich ("Mother") brought this action in 2005 on behalf of her daughter,

Heather Zipprich ("Plaintiff" or "Claimant")[1], pursuant to sections 405(g) and 1383(c)(3) of the

Social Security Act, 42 U.S.C. §§ 405(g), 1383(c). The Plaintiff challenges the final decision of

the Commissioner of Social Security, Jo Anne B. Barnhart ("Commissioner"), denying her

application for Social Security disability benefits. Specifically, the Plaintiff contends that the

ALJ failed to consider additional medical evidence dated after May 2002 and did not properly

evaluate all of the medical evidence in the record. Now before the court are the parties' cross-

motions for judgment on the pleadings. For the reasons set forth below, the defendant's motion

is DENIED and the plaintiff's motion is GRANTED to the extent that the case is remanded to the

Social Security Administration for further proceedings consistent with this opinion.

------

[1] I note for the record that when Marianne Zipprich first filed for disability benefits, she
did so on behalf of her then minor child, and therefore she could be deemed the "Plaintiff" in this
matter. However, as Heather Zipprich is now an adult and the claimant, I will refer to Heather
Zipprich throughout this Memorandum & Order as the Plaintiff, or Claimant.

# I.    Background

## A.    Procedural History

On February 28, 1991, the Plaintiff's mother filed an application for Social Security disability benefits on behalf of the Plaintiff, alleging that the Plaintiff, who was nine years old at the time, suffered from a learning disability.  (Transcript of the Record ("Tr.") at 27-39.))  The Social Security Administration ("SSA") approved the application on May 29, 1991, relying on the following diagnoses: oppositional disorder ("OD"), attention deficit disorder ("ADD"), and learning disability ("LD").  (Id. at 40-41.)  On April 9, 1997, the SSA informed the Plaintiff that her disability case would be reviewed again to decide if she remained disabled under the new definition of disability for children.[2]  (Id. at 42.)  After reviewing the Plaintiff's case again on July 18, 1997, the SSA determined that the Plaintiff's disability met Sec.112.02B2 of the Listing of Impairments.[3]  (Id. at 43.)  The Plaintiff's disability payments continued.  (Id.)  Following this,

---

[2] Congress revisited the subject of SSI benefits for children in 1996 with the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104-193, §§ 211 to 212, 110 Stat. 2105, 2188-94 (1996) (the "Welfare Reform Act").  The Welfare Reform Act's new definition provides that a child under eighteen years of age is "disabled" if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i)(2000); see also Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 83 (2d Cir. 2003).

[3] 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.02B2 defines this listing as follows: (a) Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

(b) Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who

the SSA reviewed the Plaintiff's disability case again and determined on February 22, 1999 that she was still disabled and eligible to receive disability payments. (Id. at 54.) One month before the Plaintiff's eighteenth birthday on July 5, 1999, the SSA notified the Plaintiff that she would be reexamined to decide if she was disabled under the disability rules for adults. (Id. at 55.) On September 2, 1999, the SSA determined that the Plaintiff was disabled under the disability rules for adults. (Id. at 54.) Three years later, the Plaintiff's case was again reviewed, and, on May 29, 2002, the SSA determined that the Plaintiff was no longer disabled and denied her application. (Id. at 61-63.) The Plaintiff requested a hearing. After a hearing held on August 3, 2004, Administrative Law Judge Sol A. Wieselthier ("the ALJ") determined that the Plaintiff was no longer eligible for disability benefits. This decision became final after the Appeals Council denied the Plaintiff's request for review of the ALJ's decision. (Id. at 6-8.) This action challenging the Commissioner's final decision was then timely filed in accordance with 42 U.S.C. § 405(g).

### B.     The Plaintiff's Personal and Employment History

The Plaintiff was born on July 5, 1981, and was 23 years old at the time of the 2004 hearing before the ALJ. (Id. at 504.) The Plaintiff testified that she graduated from Grover Cleveland High School through a special education program in October 2001. (Id. at 358.) The Plaintiff also testified that she attended cosmetology school for ten months beginning in June 2001 and obtained a temporary training certificate. (Id. at 509.) From 2002 to 2003, the Plaintiff

have knowledge of the child, when such information is needed and available) including, if necessary, appropriate standardized tests; or

(c) Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

worked as a shampooer at five or six beauty salons.  (Id. at 510.)  The Plaintiff testifies that she

was fired from all of them within two months of her employment.  (Id.)  In addition to her work

at the salons, the Plaintiff stated that she worked as a cashier and cleaner at McDonald's four or

five hours per day, two or three days per week from October 2003 until July 2004.  (Id. at 511-

512.)  The Plaintiff testified that she was fired because cutbacks needed to be made at the

restaurant.  (Id. at 512.)  In April 2004, the Plaintiff gave birth to a daughter.  (Id. at 524-25.)  At

the time of the hearing, the Plaintiff was single and living with her mother.  (Id. at 504.)

### C.    *The Plaintiff's Educational History*

In November 1995, The New York City Board of Education classified the Plaintiff in an

Individualized Education Program (IEP) report as learning disabled and recommended special

classes with related services, including speech/language therapy and counseling.  (Id. at 318-21.)

In May 1997, Ms. Vittor, the Plaintiff's special education teacher at Queens Vocational and

Technical High School in Long Island City submitted a reevaluation request because the

Plaintiff's placement was not addressing her needs.  (Id. at 317.)  Ms. Vittor reported that the

Plaintiff exhibited disruptive behavior and had five serious altercations with other students all

resulting in physical assaults.  (Id.)  The reevaluation request also stated that the Plaintiff failed

three subject classes due to cutting class, lack of self control, and her inability to stay focused.

(Id.)

On September 8, 1998, an IEP report classified the Plaintiff as "emotionally disturbed"

and recommended a highly structured and therapeutic program to address her needs with

supportive monitoring.  (Id. at 322.)  Following this report, the Plaintiff began a residential

program at Madonna Heights Services.  (Id. at 465-67.)

On May 13, 1999, an IEP report recommended that the Plaintiff continue treatment in a New York State approved Non-Public School (NPS) Residential facility with related services. (Id. at 337.)  The IEP evaluation reported that the Plaintiff was taking medication for attention deficit and hyper-activity.  (Id. at 341.)  The IEP described the Plaintiff as "a very troubled girl" who is highly impulsive and resistant.  (Id. at 340.)  It also reported that she was functioning at the second grade level in reading and the third grade level in math, and that a highly structured therapeutic milieu 24 hour program was required to address her significant behavior and social needs.  (Id. at 340.)

From August 21, 2000 to September 11, 2000, the Plaintiff underwent an assessment of her interests, aptitudes, and academic levels to assist in determining realistic vocational goals at the Board of Cooperative Educational Services (BOCES).  (Id. at 459.)  The report stated that the Plaintiff displayed unreliable attendance and punctuality and did not adhere to program rules and structure.  (Id. at 459.)  In addition, the Plaintiff displayed immature behavior, negative attitude, and put no effort into her performance.  (Id.)  The report stated that the Plaintiff interacted appropriately with co-workers and initiated conversations easily, but that she did not carefully listen to directions, needed detailed explanations, repetition, assistance and demonstrations.  (Id.) The Plaintiff was also listed as having poor frustration tolerance, perseverance, and a short attention span.  (Id.)  The report concluded by stating that the Plaintiff's expressed interest in cosmetology, child care, or nail technician was not a realistic vocational goal at the time due to academic limitations, short attention span, unreliable work habits, lack of initiative, interest, motivation and energy, negative attitude and immature behavior.  (Id.)

On February 8, 2001, the Plaintiff, now almost twenty years old, underwent an

educational evaluation.  (Id. at 470-73.)  Kauser Sandhu, the clinician who conducted the evaluation, concluded that the Plaintiff's reading and math skills were in the fourth to fifth grade range, while showing progress in both math and reading skills.  (Id. at 473.)  On March 7, 2001, a speech/language progress report revealed a delay in the Plaintiff's receptive and expressive language.  (Id. at 352.)  It also stated that the Plaintiff's semantic development was well below age expectancy and she had great difficulty following oral directions.  (Id.)  The report concluded by recommending the continuation of speech and language therapy.  (Id.)

On May 3, 2002, the Plaintiff's guidance counselor from Grover Cleveland High School reported that the Plaintiff graduated from high school on January 29, 2002.  (Id. at 358.)  She also reported that the Plaintiff was learning disabled, needed additional time to complete tasks, exhibited episodes of low frustration tolerance, and had angry outbursts, although the frequency had decreased over a period of eight months between 2001 and 2002.  (Id. at 358-60.)

### D. The Plaintiff's Medical History

In a clinical report dated October 13, 1989, the school psychologist of P.S. 213Q described the Plaintiff's general functioning as impulsive, resistant, and defiant.  (Tr. at 283-89.)  The following year, the Plaintiff underwent behavior therapy for impulse control and oppositional behavior.  (Tr. at 397-99.)  In May 1991, Dr. Mahjaheen Malik, a state agency medical consultant, diagnosed the Plaintiff as having moderate limitations in cognitive development/function, social/behavioral development/function, personal/behavioral development/function, and in concentration, persistence and pace.  (Id. at 400-01.)  Dr. Malik also noted that the Plaintiff did not have any speech, hearing or motor development deficiencies, but suffered from OD, ADD, LD, and had a severe impairment in her emotions and moderate

problem in her social development and in her personal behavior. (Id. at 40-41.)

From September 1994 to June 1996, the plaintiff received pharmacotherapy and was put on Ritalin by Dr. Shella Solis at Schneider Children's Hospital. (Id. at 422.) The goals of the treatment were to increase her attention span and to decrease her impulsivity, hyperactivity, as well as physical and verbal aggression and disruptive behavior; to eliminate oppositional behavior; to improve socialization skills; and to increase her compliance with rules and directions. (Id.) It is noted by Dr. Solis that the Plaintiff "responded well to psychostimulant treatment as she showed an increased ability to focus and concentrate, and decreased hyperactivity and impulsivity". (Id.) Despite adequate control of her Attention Deficit Hyperactivity Disorder (ADHD) symptoms,[4] the Plaintiff remained oppositional and continued to have difficulty getting along with her peers, according to Dr. Solis. (Id.) Dr. Solis recommended that the Plaintiff continue her mediation and continue attending a therapy group for her social/behavioral deficiencies. (Id. at 423.) Treatment ceased in June 1996 due to her therapist, Dr. Solis, leaving the clinic at Schneider Children's Hospital. (Id.)

On May 20, 1997, Dr. Branch from Schneider's Children Hospital diagnosed the Plaintiff, now age 16, with bipolar disorder manic and ADHD. (Id. at 411.) The doctor also reported that the Plaintiff responded to Lithium therapy, showing decreased distractibility, but still had problems with impulsivity and restlessness. (Id.) On the same day, Dr. Lantzouni, another doctor at Schneider's Children's Hospital, reported that the Plaintiff had an oppositional

---

[4] The *Diagnostic and Statistical Manual of Mental Disorders*, a handbook published by the American Psychiatric Association for diagnosing mental disorders in the United States, in effect renamed ADD to ADHD in 1987. *See* American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders (3th ed.1987). Thus for purposes of this opinion, there is no considerable difference between ADD and ADHD.

behavioral disorder and had limitations in communication and social/emotional skills.  (Id. at 404-07.)  On July 7, 1997, Karen Gamino, M.A., C.C.C., a Speech/Language Pathologist, evaluated the Plaintiff and reported that the Plaintiff demonstrated an overall moderate to severe delay in language skills for her age.  (Id. at 427-28.)  Continued speech and language therapy was recommended.  (Id.)

On September 11, 1998, a psychological report administered by Dr. R. McGowan of Madonna Heights Services revealed that the Plaintiff is "a very troubled girl."  The report described the Plaintiff as highly impulsive, resistant, distractible, and as having a very low frustration tolerance.  (Id. at 467.)  On the WAIS-R[5], the Plaintiff obtained a verbal IQ of 79, a performance IQ of 75, and a full scale IQ of 76.[6]  (Id.)  Dr. McGowan concluded that these numbers should not be considered a valid measurement of the Plaintiff's abilities because of the presence of "many strong emotional factors involved in her clinical and projective profile which no doubt suppress her true verbal and performance and full scale scores."  (Id.)  Her projective profile was described as being "fraught with all kinds of problems."  (Id.)  On September 30, 1998, Nina Gurevich, M.D., a psychiatrist for Madonna Heights Services, reported in a psychiatric Diagnostic Evaluation that:

[Plaintiff's] behavior in school has been deteriorating especially since 1997.  On the

---

[5] Wechsler Adult Intelligence Scale-Revised (WAIS-R) is a general test of intelligence standardized for use with adults over the age of 16.

[6] The Diagnostic and Statistical Manual of Mental Disorders-IV (DSM-IV) is the definitive source for the classification of mental illnesses.  See American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994).  The DSM-IV categorizes an individual with an IQ between approximately 50-55 to approximately 70 as one suffering from mild mental retardation.

mental status [Plaintiff] presented as a youngster who appeared in her own world. She appeared scattered, did not maintain eye contact, was closing her eyes, and gesticulating inappropriately. She talked incessantly and had difficulty listening. She appeared hyperactive and distractible. While her diagnosis of ADD was obvious, it could not fully explain her difficulty with verbal and non-verbal communication, and paranoid quality, and a thought disorder. Certainly Receptive-Expressive Language Disorder[7] has to be ruled out as has to be Bipolar Disorder Not Otherwise Specified ("NOS")[8]. [Plaintiff]'s assets include supportive mother and good physical health. Her liabilities include long history of poor functioning, poor response to treatment and communication difficulties, as well as the fact that she is already 17 and so far behind academically.

(Id. at 442.) Dr. Gurevich also reported that:

She certainly is in need of psychotropic medications. I will presently restart her on Ritalin to target symptoms of inattention and distractibility, and monitor her closely. It is possible that she needs several other medications to help her with her paranoia and agitation. At the present state of mind, [Plaintiff] is the best candidate for behavioral treatment. More history is essential.

(Id.)

On February 22, 1999, E.M. Kamin, Jr., Ph.D., a state agency medical consultant,

diagnosed the Plaintiff as "emotionally disturbed," suffering from LD, ADHD, and OD. He

found that her medical disposition was functionally equal to the severity of section 112.02B2 in

20 C.F.R., Part 404, Subpart P, Appendix 1. (Id. at 443.) The doctor also indicated that the

Plaintiff had "marked" limitations in social functioning and in concentration, persistence, and

pace. (Id. at 445.) On July 22, 1999, a state agency medical consultant, whose identity is

_____

[7] Receptive-Expressive Language Disorder - communication disorder in which both the receptive and expressive areas of communication may be affected in any degree, mild to severe. See DSM-IV 315.32.

[8] Bipolar Disorder NOS is one of four categories of bipolar disorder that does not meet the criteria of the other three subtypes, which include: Bipolar I, Bipolar II, and Cyclothymia. See DSM-IV-TR.

unknown, reported that the Plaintiff had a learning disability, oppositional disorder, and ADD. (Id. at 158.) The medical consultant also reported that the Plaintiff's medical disposition functionally equaled Listing 112.02B2. (Id.) In August 1999, a psychiatrist from the Plaintiff's residential treatment center, Madonna Heights, reported that the Plaintiff, now age 18, was being treated for ADHD, bipolar disorder, and a learning disability. (Id. at 451.) The report described the Plaintiff as being "very impulsive", having a "poor frustration tolerance" and "difficulties making appropriate decisions", "an unstable mood", "difficulties with consistent job performance", "difficulty concentrating", and "oppositional behavior". (Id. at 451-57.)

On April 29, 2002, Herbert Meadow, M.D., evaluated the Plaintiff and diagnosed her as having learning disabilities, specifically in math, but did not think that psychiatric treatment was necessary. (Id. at 475.) He reported that:

> [Plaintiff] has a history of one psychiatric hospitalization in 1997 at Long Island Jewish for a period of five months. She states that she had to get a lawyer to get herself out of there and she states that she was placed in the hospital because of disruptive behavior and impulsive acting out, but states that she felt she should not have been there. She had no psychiatric follow-up and is not in psychiatric treatment at the present time and is on no medication.

(Id. at 474.) On the subject of her mental status, the doctor reported that:

> There is no psychomotor pathology. Her speech was logical, coherent, goal directed. There was no loosening of associations, circumstantial or tangential thinking. No thought disorder was evident. No auditory or visual hallucinations or delusions. No paranoid ideation or ideas of reference were noted. Her mood was euthymic. Her affect was appropriate.

(Id.) With respect to her intellect and daily activities, Dr. Meadow's report stated that:

> [Plaintiff] was oriented times three. Her general fund of information was fair. She was

able to repeat four numbers forward but confused the numbers in reverse order. She made several mistakes in attempt to add and subtract single digit numbers. She was correctly able to state there were 11 quarters in $2.75. She was able to describe the similarities between an apple and an orange. Intelligence level is judged to be in the low average range. Insight and judgment were unimpaired. At home she watches television, listens to music, reads, has friends and helps out with chores.

(Id.) In closing, Dr. Meadow opined that "while the claimant has some academic deficiencies, it would not necessarily interfere with her ability to function in a job setting." (Id. at 473-75.)

On May 17, 2002, Allan M. Hochberg, Ph.D., a state agency medical consultant, completed a Psychiatric Review Technique form regarding the Plaintiff. (Id. at 429, 480-93.) Dr. Hochberg reported that the Plaintiff had a learning disability and a history of ADHD. (Id. at 481.) He also found that the Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Id. at 490.) He also stated that the claimant was not on any medications with no psychiatric follow-up, and was attending a beauty school to become a beautician. (Id. at 429.) He opined that the Plaintiff was "functioning substantially better now" than when she was receiving treatment at Madonna Heights in August 1999. (Id. at 429.)

On May 28, 2002, Dr. Hochberg indicated in a mental residual functional capacity assessment that the Plaintiff was not significantly limited in the following areas: (1) the ability to remember locations and work-like procedures; (2) the ability to understand and remember very short and simple instructions; (3) the ability to carry out very short and simple instructions; (4) the ability to make simple work-related decisions; (5) the ability to interact appropriately with the general public; (6) the ability to ask simple questions or request assistance; (7) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness; (8) the ability to be aware of normal hazards and take appropriate precautions; and (9) the ability to travel in unfamiliar places or use public transportation. (Id. at 476-77.) The doctor also reported that the Plaintiff was moderately limited in the following areas: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (5) the ability to sustain an ordinary routine without special supervision; (6) the ability to work in coordination with or proximity to others without being distracted by them; (7) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) the ability to accept instructions and respond appropriately to criticism from supervisors; (9) the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (10) the ability to respond appropriately to changes in the work setting; and (11) the ability to set realistic goals or make plans independently of others. (Id.) In assessing the Plaintiff's functional capacity, the doctor opined that improvement had occurred. (Id. at 478.)

On August 3, 2004, Dr. Edward M. Halpren, a medical expert, testified at the Plaintiff's hearing before ALJ Sol A. Wieselthier. (Id. at 496-550.) Dr. Halpren testified that the Plaintiff had moods and problems in terms of relating to people which results in her inability to hold onto a job. (Id. at 533.) He also testified that the Plaintiff's IQ of 80 was "perhaps a little bit lower

than low average," but was still much higher than the listings of 69.[9]  (Id. at 536.)  Based on the

Plaintiff's own testimony that she worked at a number of beauty salons and the consultative

exam conducted by Dr. Herbert Marrows, who described the Plaintiff as having academic

deficiencies which "would not necessarily interfere with her ability to function in a job setting,"

Dr. Halpren concluded that there was no psychiatric diagnosis that would interfere with the

Plaintiff's ability to work "one year before or one year after" May 2002, when the Plaintiff was

first found not to be disabled by the Social Security Administration.  (Id. at 533.)

## II.  Discussion

### A.  *Standard of Review*

A district court may set aside the Commissioner's determination that a claimant is not

disabled only if the factual findings are not supported by substantial evidence or if the decision is

based on legal error.  42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  To

be supported by substantial evidence requires "more than a mere scintilla."  It means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971).  Furthermore, a reviewing court should verify

that a claimant had a "full hearing under the Secretary's regulations and in accordance with the

beneficent purposes of the Act."  Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) (quoting Gold

v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).

A full hearing includes a well-developed medical record.  Because of the non-adversarial

nature of a benefits hearing, where the record is incomplete, an ALJ has an affirmative duty "to

---

[9] An IQ of 69 is the minimum IQ required to be considered "mildly retarded".

develop a claimant's medical history even when the claimant is represented by counsel . . . ." Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). Further, a court may order the Secretary to consider additional evidence upon "a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988).

### B.    The ALJ's Decision

To receive benefits, a claimant must be "disabled" within the meaning of the Social Security Act. Shaw, 221 F.3d at 131. Agency rules require the Commissioner to apply a five-step sequential analysis to evaluate whether an adult claimant is disabled. See 20 C.F.R. § 404.1520.[10]

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

---

[10] Note that when the applicant is a child under the age of 18, the analysis follows only the first three steps, and does not consider steps four and five employed in the adult analysis. See 20 C.F.R. § 416.924(a). The steps to determining whether a child is disabled under the Act is discussed, infra, at subsection E.3.

4.      If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.      If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

Shaw, 221 F.3d at 132 (citing DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998)). Accordingly, to create an irrebuttable presumption of disability pursuant to the regulations, the claimant must either have a "listed impairment," or one that is "equal to"a listed impairment. 20 C.F.R. §§ 404.1520(d), 416.920(d) ("If you have an impairment(s) which . . . is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience."); Shaw, 221 F.3d at 132.

The ALJ acknowledged this five-step analytical framework in his decision. (Tr. at 17.) He considered the Plaintiff's eligibility for benefits up to May 2002, the date when she was first found to not be disabled. He found that Plaintiff met the disability requirements of the first two steps because she was not engaged in gainful activity, (id. at 20), and had a severe impairment within the meaning of 20 C.F.R. §§ 404.1521. (Id.) At step three, however, the ALJ found that Plaintiff "does not have an impairment or combination of impairments, which meets or equals the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4, as established by expert testimony." (Id.) Proceeding to step four, the ALJ concluded that Plaintiff "worked sporadically but has not worked on a sustained basis and has no past relevant work." (Id.) At step five, the ALJ concluded that "considering the claimant's residual functional capacity, age, education, and work experience, and the testimony of the vocational expert, the claimant retained

the ability to perform a significant number of jobs that exist in the national economy as of May 2002." (Id.)

In coming to the determination at step three of the analysis that the Plaintiff's severe impairment did not meet an impairment listed in Appendix 1 of the regulations, the ALJ relied on medical reports by Dr. Herbert Meadow, and on Dr. Edward Halperin's testimony at the August 3, 2004 hearing. (Id. at 17.) The ALJ wrote:

> The record discloses, as Dr. Edward Halperin, the medical expert, testified that the claimant was in special education until she graduated from high school and she has a learning disability and functions in the low average or a little lower than average intelligence but she does not have a psychiatric diagnosis that would interfere with work activity. It was noted that she was able to attend cosmetology school. The medical expert testified the claimant's impairments do not meet or equal the requirements of a listed impairment. It is therefore concluded that the claimant does not have an impairment or combination or impairments with findings that meet or equal the requirements of a listed impairment as the medical expert testified.

(Id.)

At step 5 of the analysis, the ALJ based his determination that the Plaintiff has the residual functional capacity to perform other jobs existing in significant numbers in the national economy on the testimony of vocational expert, Mark Ramnouth, and the Plaintiff's own testimony. In considering the Plaintiff's testimony, the ALJ noted that the Plaintiff testified to watching television a couple of hours per day, going to the gym three times per week, reading cosmetology books, visiting friends, attending church, shopping with her mother, caring for her baby, and going out looking for employment. (Id. at 18.) At the hearing, Mr. Ramnouth testified that the Plaintiff previously worked at McDonald's for almost eight months and worked as a clerk in a beauty salon. (Id. at 538). Mr. Ramnouth categorized the Plaintiff's fast food work as

an unskilled, light-duty occupation with an Specific Vocational Preparation ("SVP") of two, DOT code 311.472-010.  (Id.)  He then categorized the Plaintiff's work in the beauty salon as a low semi-skilled, light-duty occupation, DOT code 339.687-010.  (Id. at 538-39.)  He opined that the Plaintiff could return to fast food work because she had no physical limitations and no restrictions on sitting, standing, or walking.  (Id. at 541.)  Mr. Ramnouth also listed several other types of jobs that he felt that the Plaintiff could do, including the following: (1)  assembly work, of which there are 5,000 jobs in the local labor market and 500,000 in the national labor market, SVP two, unskilled occupation, light-duty, DOT code 789.687-046; (2) retail marking and packing merchandise for sale, of which there are 4,000 local jobs and over 100,000 in the national labor market, SVP two, light-duty occupation, DOT code 209.587-034; and (3) hand packager, of which there are 10,000 local jobs and over 500,000 in the national labor market, SVP two, medium-duty occupation, unskilled, DOT code 920.587-018.  (Id. at 542-43.)

### C.   Analysis

#### 1.  Lack of Treatment

In determining that the Plaintiff had the ability to function in a job setting as of May 2002, the ALJ incorrectly considered the Plaintiff's lack of treatment as evidence of lack of disability.  (Tr. at 19.)  The Plaintiff is a single mother who is currently unemployed with no other means of support besides her mother.  (Id. at 469.)  She was not taking medication for her disability from March 7, 2001 until the birth of her daughter in April 2004.  (Id.)  Considering the Plaintiff's mother's income records (id. at 258-80), testimony regarding her mother's financial situation (id. at 546), and testimony regarding her efforts to get her daughter into a treatment

center, the Plaintiff's lack of treatment could easily be attributed to her limited financial resources and not her lack of need for treatment.  See Shaw v. Chater, 221 F.3d 133 (2d Cir. 2000) (rejecting ALJ's reasoning that a lack of treatment suggests lack of disability because "it was not unreasonable for [claimant] to discontinue those treatments, particularly in light of his testimony that he could not afford further medical care"); see also Garcia v. Barnhart, 01-Civ.-8300, 2003 U.S. Dist. LEXIS 159, at *25 (S.D.N.Y. Jan. 6, 2003) (rejecting ALJ's finding that claimant is not disabled because she did not obtain regular treatment without considering her limited resources, ability to travel, and success with the treatment as "contraven[ing] the purpose of the social security benefit system").

Given the Plaintiff's dependency on her mother and her mother's financial situation, it was unreasonable for the ALJ to consider the Plaintiff's lack of treatment as evidence of disability, or lack thereof, without considering alternative reasons for the lack of treatment. Therefore, any determination by the ALJ that the Plaintiff's lack of treatment suggests lack of disability is rejected.

### 2.     *Additional Evidence*

The Plaintiff argues that the ALJ did not properly develop the entire medical record in making his final determination.  Specifically, the Plaintiff submitted in advance of her hearing two letters to the ALJ from Glendale Mental Health Clinic dated May 26, 2004 and September 14, 2004, respectively.  (See Exhibits attached to Plaintiff's Complaint).  The letters, written by the Plaintiff's treating therapist, reported that the Plaintiff was admitted to Elmhurst Hospital Inpatient Psychiatric Unit on April 11, 2004 with manic symptoms following the birth of her

daughter.  The letter stated that the Plaintiff participated in group, individual, and family therapy and was prescribed Risperdol and Depakote.  (Id.)  The Plaintiff was also diagnosed as bipolar with most recent hypomanic, postpartum onset, and R/O Borderline Personality Disorder.  (Id.)  The substance of these letters is also confirmed in a letter, dated February 9, 2005, also from Glendale Mental Health Clinic, which the Plaintiff submitted to the Appeals Council in connection with her appeal of the ALJ's decision.  (See Tr. at 12).

The Defendant argues that this new evidence, as it relates to treatment the claimant received years after May 2002 and relating to the claimant's postpartum depression following the birth of her daughter in April 2004, is not material.  In his decision, the ALJ agreed with the Defendant, stating that:

> We're going back to 2002.  That's our cut-off date.  If there's a new disability now, or if the disability has worsened, then you have to make a new application, if I find that the cessation was correct, because there's a two-year gap.  We're talking now as of May 2002.  That's basically what Social Security found, based on the examination that was done.

(Tr. at 501-02.)

The Social Security Act provides that a district court may order the Secretary to consider additional evidence, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988).  "An appellant must show that the proffered evidence is (1) new and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative."  Id.  "Finally, the claimant must show (3) good cause

for her failure to present the evidence earlier." Id. Because this standard presents primarily factual issues, it is the district court that must determine its application in the first instance. Carroll v. Secretary of Health and Human Services, 705 F.2d 638, 644 (2d Cir. 1983).

First, the new evidence relating to the Plaintiff's treatment at the Glendale Mental Health Clinic is new and not merely cumulative of what is already in the record. The letter refers to new treatment that the Plaintiff was undergoing for postpartum depression after the birth of her child in April 2004.

Second, the new evidence is material because it is both relevant to the time period for which benefits were denied and probative, because it may have affected the ALJ's consideration of the Plaintiff's claim. I am not persuaded by the Defendant's position that the Plaintiff must file a new application for benefits because her treatment at the Glendale Mental Health Clinic beginning in May 2004 for postpartum depression was for an "entirely separate condition from her condition which she claimed disabled her." In Pollard v. Halter, the Second Circuit decided that new evidence of a child claimant's disability should have been considered by the district court in its review of the denial of a claim for Supplemental Security Income (SSI) even though the new evidence consisted of documents generated after the ALJ rendered his decision. 377 F.3d 183 (2d Cir. 2004) There, the circuit court reasoned that the new evidence was material and directly supported many of the mother's earlier contentions regarding the child's condition and strongly suggested that, during the relevant time period, the child's condition was far more serious than previously thought and that additional impairments existed when the child was younger. (Id. at 193.)

Here, the situation is analogous. The Plaintiff has had a long medical history of bipolar

disorder dating back to May 20, 1997, when she was diagnosed as having bipolar disorder manic

by Dr. Branch at Schneider's Children Hospital. (Id. at 411.) She also received treatment for the

disorder in August 1999, at Madonna Heights. (Id. at 451.) Though Dr. Hochberg's report of

May 17, 2002 opined that the Plaintiff was "functioning substantially better now" than when she

was receiving treatment at Madonna Heights in August 1999, that is no longer the case. (Id. at

429.) The Plaintiff's recent diagnosis of bipolar disorder, borderline personality disorder and

postpartum depression does not appear to be an unrelated, isolated lapse in the Plaintiff's mental

health. To the contrary, the recent diagnosis strongly suggests that the Plaintiff's condition is far

more serious than the ALJ's finding that the Plaintiff has a learning disability. Indeed, it may be

more consistent with the mother's contentions that "you don't just lose a disability, and then

regain a disability". (Tr. at 533.) In light of the Plaintiff's extensive medical history and the

recent medical developments following the birth of her daughter, I find that the ALJ failed in his

affirmative duty "to develop a claimant's medical history" by not considering any congruent

medical evidence relating to the Plaintiff's health after May 2002.

The final requirement, that a plaintiff show good cause for failure to present the evidence

earlier, does not apply in this case as the Plaintiff introduced the evidence into the record prior to

the August 3, 2004 hearing before the ALJ. At issue is whether or not the ALJ was correct in

disregarding the new evidence.

Considering the Plaintiff's long medical history and the materiality of the new evidence, I

find that the ALJ erred in holding that the evidence submitted by the Plaintiff relating to her

hospitalization for postpartum depression cannot be considered because it was not material. The

ALJ based its finding of non-materiality on the fact that the new evidence did not explicitly refer

to the relevant time period.  I, however, conclude that the new evidence was material.  On remand, the Commissioner should consider this new evidence in conjunction with the existing administrative record.

### D.      *Remand or Award of Benefits*

The Plaintiff requests that the Defendant's decision be reversed and disability payments be continued.  Reversal of the ALJ decision and remand solely for the calculation of benefits is appropriate "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."  Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  However, "when there are gaps in the administrative record or the ALJ has applied an improper legal standard," a court should remand the case to the Commissioner for the further development of the record.  Id.; see also Sobolewski v. Apfel, 985 F. Supp. 300, 315 (E.D.N.Y. 1997) ("Where there are gaps in the administrative record, remand to the Commissioner for further development of the evidence is in order.")

The ALJ did not properly consider the entire medical record in his decision.  Specifically, the ALJ should have further developed and taken into consideration all medical evidence between May 2002 and the December 16, 2004 decision.  The medical evidence during this period casts doubt upon the ALJ's findings and strongly suggests that the Plaintiff's disability continues unabated.  Accordingly, remand is the appropriate remedy in this case because "it is for the SSA, and not [a] court, to weigh the conflicting evidence in the record."  Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998).

**II.     Conclusion**

For the foregoing reasons, the Commissioner's motion is DENIED and the Plaintiff's motion is GRANTED to the extent that this case is REMANDED to the Social Security Administration for further proceedings consistent with this opinion.


SO ORDERED.

Dated: August 16, 2006                         _____/s/_____
       Brooklyn, N.Y.                         Nicholas G. Garaufis
                                United States District Judge